United States District Court
Southern District of Texas

**ENTERED**

February 04, 2020

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IDEAL MANUFACTURING, INC., | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 1:19-cv-164 |
| | § | |
| NGC GROUP, INC., ET AL., | § | |
| Defendants | § | |

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

The Court is in receipt of Plaintiff Ideal Manufacturing, Inc.'s opposed "Motion to Compel North American Specialty Insurance Company to Arbitrate, Motion to Stay Litigation, and Brief in Support" (hereinafter, Plaintiff's "Opposed Motion"). Dkt. No. 19. For the reasons provided below, it is recommended that the Court: (1) **DENY** Plaintiff's Opposed Motion to the extent it seeks to compel arbitration; (2) **GRANT** Plaintiff's Opposed Motion to the extent it seeks a stay of litigation; and (3) **DIRECT** the Clerk of the Court to stay this case until further order of the Court.

## I. Jurisdiction

This case involves the construction of a wind farm in Cameron County, Texas. Dkt. No. 24 at 2; Dkt. No. 26 at 3-4. In brief, Plaintiff alleges that Defendants are liable for failing to pay Plaintiff adequately for the materials and services Plaintiff provided in connection with the wind farm's construction. Dkt. No. 26 at 3-4. The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332.

## II. Background

On October 11, 2019, United States District Judge Rolando Olvera signed the parties' "Stipulation and Agreed Order Regarding Defendants' Motion to Compel Arbitration and Dismiss or Stay Proceedings" (hereinafter, "Agreed Order"). Dkt. No. 22.  Pursuant to the Agreed Order, Plaintiff and Defendant NGC Group Inc., (hereinafter, "NGC") have agreed that Plaintiff's claims against NGC will be resolved in arbitration and will be stayed in this Court pending the outcome of that arbitration.  *Id.*  The only other remaining defendant in this case is NGC's surety, North American Specialty Insurance Company (hereinafter, "NASIC").  *See* Dkt. No. 19 at 2 (referring to NASIC as NGC's surety); Dkt. No. 24 at 1 (same).  Despite negotiating, Plaintiff and NASIC have failed to reach agreement regarding whether Plaintiff's claims against NASIC should be arbitrated or stayed pending the resolution of the arbitration between Plaintiff and NGC.  Dkt. No. 22 at 2.  Having failed to reach an agreement, Plaintiff filed its instant Opposed Motion.  Dkt. No. 19.

Plaintiff's Opposed Motion asks the Court to compel NASIC to arbitrate, and to stay the litigation of Plaintiff's claims against NASIC until their arbitration is complete.  Dkt. No. 19 at 13.  Plaintiff acknowledges that NASIC did not sign a contract with Plaintiff requiring it to arbitrate, but asserts that the Court can compel NASIC to arbitrate under the direct-benefits-estoppel doctrine and the incorporation-by-reference doctrine.  *Id.* at 5.  Plaintiff argues that there are additional practical reasons to require NASIC to arbitrate.  *Id.* at 4-5, 11-13.  In response, both NASIC and NGC argue that requiring NASIC to arbitrate is inappropriate and unnecessary.

Dkt. No. 24. NASIC and NGC contend that Plaintiff's claims against NASIC should be stayed pending the outcome of the arbitration between NGC and Plaintiff because: (1) NASIC's liability as NGC's surety only arises if NGC is found liable to Plaintiff in the arbitration; and (2) NASIC has not subjected itself to mandatory arbitration through agreement, "estoppel, incorporation, or otherwise." *Id.* at 1.

## III. Discussion

Plaintiff's Opposed Motion refers to its "claims" against NASIC. Dkt. No. 19 at p. 3, ¶ 4 ("Ideal would show that the surety, NASIC, should also be compelled to arbitrate Ideal's claims against it."). At the time Plaintiff filed its Opposed Motion, Plaintiff's Original Petition was the live complaint in this action. *See* Dkt. No. 1-4. Plaintiff's Original Petition asserted only one claim against NASIC, which Plaintiff described as a "Common Law Payment Bond Claim." *Id.* at 6-7.

After filing its Opposed Motion, and with the Defendants' written consent, Plaintiff filed its First Amended Complaint (hereinafter, "Live Complaint"). Dkt. No. 26. The parties have agreed that Plaintiff's amendment should not affect the pendency of Plaintiff's Opposed Motion, which the parties agree should still be considered by the Court. Dkt. No. 25 at 1. Plaintiff's Live Complaint adds a claim against NASIC and NGC entitled "Claim on Bonds to Release Mechanic's Lien" (hereinafter, the "Lien Release Claim"). Dkt. No. 26 at 6.[1] Thus, Plaintiff's Live

---

[1] Because Plaintiff's Opposed Motion was filed before it amended its Live Complaint to add the Lien Release Claim, its Opposed Motion does not address the Lien Release Claim. As Plaintiff has not filed any subsequent pleadings which argue that NASIC should be compelled to arbitrate its Lien Release Claim, any argument to that effect that is not already covered

Complaint contains two claims against NASIC: the new Lien Release Claim, and Plaintiff's existing claim against NASIC and NGC entitled "Common Law Payment Bond Claim" (hereinafter, the "Bond Claim"). *Id.* at pgs. 6-7, ¶¶18, 21-22. In support of these two claims, Plaintiff alleges as follows:

### Claim on Bonds to Release Mechanic's Lien (NGC and NASIC)

18. As demonstrated in Exhibit "A" attached hereto, IDEAL timely and properly filed and served its statutory liens in compliance with the laws and constitution of the state of Texas. IDEAL brings this action for recovery of the perfected balances due and asserts a claim against each of the Bonds to Release Mechanic's Lien issued by NASIC as Surety and NGC as Principal pursuant to Subchapter H of Chapter 53 of the Texas Property Code. The timely and perfected amounts owed in connection with the liens filed by IDEAL are the principal amount of $1,787,216.82 in connection with materials provided by IDEAL to the Project pursuant to the Materials Agreement, and the principal amount of $171,174.47 in connection with services provided by IDEAL to the Project pursuant to the Installation Agreement, for a total perfected amount of $1,958,391.29 asserted against the Bonds to Release Mechanic's Lien and their applicable riders. IDEAL also seeks recovery of its necessary and reasonable attorney's fees and costs pursuant to Texas Property Code § 53.156.

### Common Law Payment Bond Claim (NGC and NASIC)

21. IDEAL furnished and delivered the necessary materials and services pursuant to the Agreements with NGC. IDEAL sent the requisite notices of the amounts unpaid and due on its Agreements in accordance with the terms of the Payment Bond issued by NASIC as

---

by the analysis in this Report is waived. *See F.D.I.C. v. Mijalis,* 15 F.3d 1314, 1327 (5th Cir. 1994) (litigants "must press and not merely intimate the argument during the proceedings before the district court[,]" or the argument will be waived); *In re Hunt,* 124 B.R. 200, 210 n. 11 (N.D. Tex. 1991) (inadequately briefed arguments need not be considered); *In re Nary,* 253 B.R. 752, 762 n. 23 (N.D. Tex. 2000) (same). *See also Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir. 1994) (finding arguments not presented to the magistrate judge in the first instance were waived); *Murr v. United States,* 200 F.3d 895, 902, n.1 (6th Cir. 2000) ("[W]hile the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.,* permits de novo review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate.") (collecting cases).

Surety and NGC as Principal. IDEAL has performed all of the acts required of IDEAL to establish a common law payment bond claim against NASIC and NGC for services and materials supplied and utilized on the Project.

22.   IDEAL brings this suit for recovery of the balance due and for judgment on its payment bond claim against NGC, as Principal, and against NASIC, as Surety, on the Payment Bond (and any Rider to same) in the amount of $3,069,215.52. IDEAL also seeks recovery of its necessary and reasonable attorney's fees and costs pursuant to the terms of the Payment Bond and applicable law.

*Id.*

The parties do not dispute certain facts which are critical to resolving Plaintiff's request to compel NASIC to arbitrate.   First, the parties agree that Plaintiff did not sign the "Payment Bond" at issue. Dkt. No. 19 at 2 ("NASIC, as surety, and NGC, as principle executed [the] payment bond"); Dkt. No. 24 at 9 (citing Dkt. No. 19-2 and noting that "the parties to the payment bond are NGC as Contractor, NASIC as Surety, and Acciona as Owner."); Dkt. No. 19-2 (containing a copy of the Payment Bond).   Second, the parties agree that there is no contract between Plaintiff and NASIC, much less a contract with an arbitration agreement. *See* Dkt. No. 19 at p. 4, ¶ 7, and p. 8, ¶ 15; Dkt No. 24 at p. 2, ¶ 5.   Third, the parties agree that Plaintiffs may not recover against NASIC without first prevailing against NGC. Dkt. No. 8 at p. 3, ¶ 11; Dkt. No. 19 at p. 9, ¶ 19; Dkt. No. 24 at 11. As Plaintiff admits, "in order to prove its bond claim against NASIC, [Plaintiff] must first establish its claims against NGC on the Subcontracts." Dkt. No. 19 p. 9, ¶ 19.

As will be demonstrated below, these facts are critical because they undermine Plaintiff's argument that NASIC must be compelled to arbitrate.   Specifically, these

facts undermine Plaintiff's reliance upon: (1) the arbitration provisions in the relevant contracts; (2) the Payment Bond, which Plaintiff claims incorporates an arbitration provision in one of the relevant contracts by reference; (3) the incorporation-by-reference doctrine; (4) the direct-benefits-estoppel doctrine; and (5) the alleged practical reasons to compel NASIC to arbitrate.  Dkt. No. 19 at 5-6.

**A. Plaintiff's Reliance upon the Incorporation-by-Reference Doctrine and the Three Relevant Contracts.**  "Incorporation by reference" refers to "[a] method of making a secondary document part of a primary document by including in the primary document a statement that the secondary document should be treated as if it were contained within the primary one." *See Incorporation by Reference*, Black's Law Dictionary (10th ed. 2014).  When the substantive law of Texas applies,[2] the incorporation-by-reference doctrine allows an unsigned paper to be incorporated by reference into "the paper signed by the person sought to be charged." *In re Prudential Insurance Co. of America*, 148 S.W.3d 124, 135 (Tex. 2004); *Norred v. Cotton Patch Cafe*, LLC, No. 3:19-CV-1010-G, 2019 WL 5425479, at *4 (N.D. Tex. Oct. 22, 2019) (same).

Plaintiff relies upon two subcontracts it executed with NGC: the "Material Supply Agreement," and the "Installation Agreement" (hereinafter, the "Subcontracts" or the "Materials Subcontract" and the "Installation Subcontract," respectively).  Dkt. No. 19 at pgs. 1-2 at ¶¶ 1-2.  Plaintiff states that both Subcontracts incorporate the "Prime Contract" between NGC and the general

---

[2] As detailed below, Texas substantive contract law applies in this case. *See infra* at p. 9.

contractor, by reference, and that the Prime Contract requires arbitration. *Id.* at p. 3, ¶ 4.[3]  Plaintiff adds that both Subcontracts also contain arbitration provisions. *Id.* at pgs. 6-7, ¶ 13.

Plaintiff admits that NASIC did not sign the Prime Contract, or the Subcontracts.  Dkt. No. 19 at p. 8, ¶ 15.  Because NASIC did not sign the Prime Contract or the Subcontracts, NASIC is a non-signatory for purposes of the arbitration provisions in those three contracts. *Id.*  Plaintiff asserts that the "federal substantive law of arbitrability governs the question of whether a non-signatory," such as NASIC, "is bound by an arbitration provision." *Id.* (citing *Washington Mut. Fin. Grp, L.L.C. v. Bailey*, 364 F.3d 260, 268 n.6 (5th Cir. 2004)).  NASIC does not rebut this assertion. *See generally* Dkt. No. 24.  Nevertheless, Plaintiff's reliance upon *Washington Mut. Fin. Grp, L.L.C. v. Bailey* is misplaced.

In *Arthur Andersen LLP v. Carlisle*, the Supreme Court clarified that, although the Federal Arbitration Act ("FAA") created substantive federal law regarding the enforceability of arbitration agreements, "background principles of state contract law" still apply when determining the scope of such agreements, "including the question of who is bound by them." 556 U.S. 624, 630 (2009).  Subsequently, in *Todd v. Steamship Mutual Underwriting Association (Bermuda) Ltd.*, the Court of Appeals for the Fifth Circuit opined that the *Carlisle* decision "made clear that state law controls whether an arbitration clause can apply to nonsignatories." 601 F.3d 329, 336 (5th Cir. 2010).

---

[3] The general contractor is Acciona Energy USA Global, LLC, (hereinafter, "Acciona").

Since the issuance of *Carlisle*, some decisions issuing from within the Fifth Circuit, and from the Fifth Circuit itself, have failed to mention or apply *Carlisle's* holding. *See, e.g., Graves v. BP America, Inc.*, 568 F.3d 221, 223 (5th Cir. 2009) (issuing two days after *Carlisle*, failing to mention *Carlisle*, and stating that the federal substantive law of arbitrability governs an arbitration provision's scope, but that less certainty exists regarding whether it governs the compulsion of non-signatories to arbitration); *Griffin v. ABN Amro Mortg. Group, Inc.*, 378 Fed. Appx. 437, 439–40 (5th Cir. 2010) (unpublished) (failing to mention *Carlisle* and applying federal rather than state law to the issue); *Fuller v. Healthcare Servs. Grp., Inc.*, No. 2:18-CV-032 D, 2019 WL 244487, at *2–3 (N.D. Tex. Jan. 17, 2019) (failing to mention *Carlisle* and stating that uncertainty exists regarding whether federal law applies to the question of whether a non-signatory can be compelled to arbitrate); *Peak Pipe & Supply, LLC v. UMW Oilfield (L) Int'l LTD*, Civil Action No. 3:18-CV-410-L, 2018 WL 6177268, at *3 (N.D. Tex. Nov. 27, 2018) (citing *Carlisle* for a different point of law, but stating that the question of which substantive law governs whether a nonparty must arbitrate was "not entirely clear"). *See also Harland Clarke Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 580 (W.D. Tex. 2014) ("Since *Carlisle* and *Todd*, some district courts have applied state law to the question of who is bound by an arbitration clause. . . . Some courts, however, have continued to find the question unsettled . . . others have continued to apply federal law . . . without discussing *Carlisle*.") (citations omitted).

Despite the failure of some courts to apply *Carlisle*, recently issued Fifth Circuit opinions confirm that *Carlisle* is binding precedent. *See, e.g., Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014) (applying *Carlisle* and noting that its "prior decisions applying federal common law, rather than state contract law" have been "modified to conform" with *Carlisle*); *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 530-32 (5th Cir. 2019) (citing *Carlisle*, applying Texas law, and noting that state law governs when an arbitration provision can be enforced against nonparties to a contract through third-party-benefit or incorporation-by-reference theories). Under *Carlisle*, then, this Court must apply applicable state law to determine whether it can compel NASIC to arbitrate. *See id.*

Plaintiff indicates that Texas law is applicable here because it relies upon Texas law, in addition to federal law under the FAA, to support its argument that NASIC must submit to arbitration. Dkt. No. 19 at 6-10. NASIC does not assert that Texas law is inapplicable, or argue that another state's law governs the question of whether it should be compelled to arbitrate. *See generally* Dkt. No. 24. Accordingly, this Court may deny Plaintiff's Opposed Motion if Plaintiff fails to meet its burden under Texas Law. *See Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 530-32 (applying Texas law and holding that the party moving to compel arbitration bears the burden to show that arbitration is appropriate).

"Under Texas law, a party can compel arbitration only by establishing: (1) the existence of a valid agreement to arbitrate; and (2) that the claims asserted by the

party attempting to compel arbitration are within the scope of the arbitration agreement." *Halliburton Energy Servs., Inc.,* 921 F.3d 522, 530 (citing *Certain Underwriters at Lloyd's of London v. Celebrity, Inc.,* 950 S.W.2d 375, 377 (Tex. App.—Tyler 1996, writ dism'd w.o.j)). Although arbitration agreements only apply to non-signatories in rare circumstances, determining whether a non-signatory is bound requires an examination of the parties' intent, as that intent is expressed in the arbitration agreement. *Id.* at 530-531 (citing *Bridas S.A.P.I.C. v. Gov't of Turkm.,* 345 F.3d 347, 355, 358 (5th Cir. 2003) and *In re Rubiola,* 334 S.W.3d 220, 224 (Tex. 2011)). This requires the examining court to look at the language of "the arbitration clause itself." *Id.* at 531. If the party moving to compel arbitration fails to show that an arbitration agreement exists between the parties, that party must show that the dispute between the parties falls within the scope of an existing arbitration agreement. *Id.* at 531-532 (citing *ASW Allstate Painting & Constr. Co. v. Lexington Inc. Co,* 188 F.3d 307, 311 (5th Cir. 1999); *Phillips v. ACS Mun. Brokers, Inc.,* 888 S.W.2d 872, 875 (Tex. App.—Dallas 1994, no writ); *Prudential Secs. Inc. v. Banales,* 860 S.W.2d 594, 597 (Tex. App.—Corpus Christi 1993, no writ)).

Plaintiff acknowledges that there is no contract between itself and NASIC, much less a contract with an arbitration agreement. *See* Dkt. No. 19 at p. 4, ¶ 7, and p. 8, ¶ 15. With respect to the three above-referenced contracts, then, Plaintiff must show that the claims it has asserted against NASIC (the Lien Release Claim and the Bond Claim) fall within the scope of an arbitration provision in at least one of the contracts. *See Halliburton Energy Servs., Inc.,* 921 F.3d 522, 531-32.

Plaintiff first relies upon the arbitration clause found in the Materials Subcontract. Dkt. No. 19 at 6-7. In relevant part, that clause provides as follows:

> DISPUTES. [NGC] and [IDEAL] agree that from time to time, there may be conflicts, disputes and/or disagreements between them, arising out of or relating to this Supply Agreement or the Materials (hereinafter collectively referred to as "Disputes"). Therefore, [NGC] and [IDEAL] agree that all such Disputes shall be resolved by binding arbitration. Arbitration shall proceed in accordance with the Construction Industry Arbitration Rules of the AAA, but the parties may select an arbitrator deemed to be mutually acceptable, and it shall not be necessary that the arbitration be administered by the AAA. [IDEAL] hereby agrees that [NGC] shall have the right to include [IDEAL], by consolidation, joinder, or other manner, in any arbitration or litigation involving [NGC], AEUG, Owner and/or any other person or entity, regardless of who originally initiated such proceedings.

Dkt. No. 19-1 at 6. *See also* Dkt. No. 10 at 3 (containing Defendants' quotation of the same text).

Plaintiff next relies upon the arbitration clause found in the Installation Subcontract. Dkt. No. 19 at 7. In relevant part, that clause provides as follows:

> Scope – All disputes between NGC and [IDEAL] arising out of, or relating to this Agreement or the Project, including all claims by [IDEAL] that NGC and [IDEAL] fail to resolve as provided in Article 7 above, shall be subject to the dispute resolution provisions provided in this Article 8. . . .
>
> [Article 8] Binding Dispute Resolution – If the parties cannot agree after these meetings on a resolution or a course of action to resolve a dispute, then the dispute shall be subject to binding dispute resolution as follows: Arbitration pursuant to AAA Construction Industry Rules.

Dkt. No. 19-1 at p. 9, ¶ 8.1, and p. 10, ¶ 8.2.4 (formatting altered). *See also* Dkt. No. 10 at 3-4 (containing Defendants' quotation of the same text). Plaintiff additionally argues that both Subcontracts incorporate the Prime Contract's arbitration

provisions, but Plaintiff does not quote any language from those provisions. Dkt. No. 19 at 7.

Plaintiff has not shown that the claims it has asserted against NASIC fall within the scope of the arbitration provisions contained in any of the three contracts. Plaintiff quotes language from the Subcontracts, but this language discusses the arbitration of disputes "between" Plaintiff and NGC, not Plaintiff and NASIC. *See* Dkt. No. 19-1 at p. 6, ¶ 13 ("[NGC] and [IDEAL] agree that from time to time, there may be conflicts, disputes and/or disagreements *between* them, arising out of or relating to the [two Subcontracts] (hereinafter collectively referred to as "Disputes"). Therefore, [NGC] and [IDEAL] agree that all such Disputes shall be resolved by binding arbitration.") (emphasis added); *id.* at p. 9, ¶ 8.1, and p. 10, ¶ 8.2.4 ("All disputes *between* NGC and [IDEAL] arising out of, or relating to this Agreement or the Project . . . shall be subject to . . . Arbitration pursuant to AAA Construction Industry Rules.") (emphasis added, formatting altered).   Further, Plaintiff has submitted a copy of the arbitration provisions contained in the Prime Contract (*see* Dkt. No. 19-1 at p. 24, ¶ 22.4), but Plaintiff does not quote or rely upon any specific language in those provisions.  Dkt. No. 19 at 7.  The Court has reviewed the arbitration clause and dispute resolution provisions of the Prime Contract on its own and can find no language indicating that the parties to the Prime Contract intended Plaintiff's instant claims against NASIC to be subject to arbitration. *See* Dkt. No. 19-1 at p. 24, ¶¶ 21.1—22.4.  Thus, even presuming that the two Subcontracts

incorporated the Prime Contract's arbitration provisions by reference, Plaintiff's has not shown how the incorporation-by-reference doctrine supports its argument.

Perhaps realizing that the text of the three contracts fail to support its argument, Plaintiff makes the additional, incongruous argument that NASIC is trying to enforce the three contracts while simultaneously "denying that *the dispute*" is subject to the arbitration clauses within the contracts. Dkt. No. 19 at p. 9, ¶ 18 (emphasis added). With respect, that is not what NASIC is doing. The "dispute" that is subject to arbitration is the dispute between NGC and Plaintiff. Dkt. No. 22. NASIC is not denying this fact, nor is it denying that it will be bound by the results of the arbitration agreement between NGC and Plaintiff. Dkt. No. 24 at 11. Rather, NASIC is denying that Plaintiff's claims against it are subject to arbitration because the arbitration clauses referenced above do not speak to disputes between NASIC and Plaintiff. Plaintiff has not shown that the incorporation-by-reference doctrine or the arbitration provisions in the three relevant contracts require this Court to compel NASIC to arbitrate Plaintiff's Lien Release and Bond Claims.

**B. Plaintiff's Reliance upon the Incorporation-by-Reference Doctrine and the Payment Bond, Which Plaintiff Claims Incorporates an Arbitration Provision Contained in the Prime Contract by Reference.** As noted above, "incorporation by reference" refers to "[a] method of making a secondary document part of a primary document by including in the primary document a statement that the secondary document should be treated as if it were contained within the primary one." *See Incorporation by Reference*, Black's Law Dictionary (10th ed. 2014).

Plaintiff argues that NASIC is bound by the arbitration provision in the Prime Contract because the "Payment Bond at issue" incorporates the Prime Contract by reference. Dkt. No. 19 at 10-11.

Here again, the problem with this argument is that Plaintiff is not a party to the Payment Bond or the Prime Contract. The Prime Contract is between NGC and Acciona. *See* Dkt. No. 19 at p. 3, ¶ 4 and Dkt. No. 24 at 8. The Payment Bond is between NASIC, as surety; NGC, as principle; and Acciona, as Owner. Dkt. No. 19 at 2 ("NASIC, as surety, and NGC, as principle executed [the] payment bond"); Dkt. No. 19-2 (containing a copy of the Payment Bond). *See also* Dkt. No. 24 at 9 (noting that "the parties to the payment bond are NGC as Contractor, NASIC as Surety, and Acciona as Owner."). Even presuming that the Payment Bond incorporated the arbitration provision of the Prime Contract by reference, which Plaintiff has not shown,[4] Plaintiff has failed to explain how this would enable it, as a non-party, to compel NASIC to arbitrate its Lien Release and Bond Claims. As NASIC points out, "[e]ven if the payment bond incorporated the arbitration provision from the Prime Contract—which it doesn't—an agreement between NGC and NASIC to arbitrate, by

---

[4] Although Plaintiff asserts that the Payment Bond incorporated the arbitration provisions of the Prime Contract into the Payment Bond by reference (Dkt. No. 19 at 10-11), Plaintiff has not shown this to be the case. For the reasons provided by Defendants, Plaintiff's assertion is conclusory and fails to show that the general incorporation language of the Payment Bond specifically incorporated the arbitration provisions of the Prime Contract into the Payment Bond. *See* Dkt. No. 24 at 9-10. Plaintiff has also failed to identify any language within the arbitration provisions of the Prime Contract which support its argument. The Court has reviewed the arbitration provisions of the Prime Contract on its own and can find no language indicating that the parties to the Prime Contract intended Plaintiff's instant claims against NASIC to be subject to arbitration. *See* Dkt. No. 19-1 at p. 24, ¶¶ 21.1—22.4.

incorporation or otherwise, is insufficient to establish an enforceable agreement to arbitrate between Ideal and NASIC." Dkt. No. 24 at 8.

The cases Plaintiff cites in support of its argument here do not disturb this conclusion. *See* Dkt. No. 19 at 11 (citing *Jewish Fed'n of Greater New Orleans v. Fid. & Deposit Co. of Maryland*, 273 F.3d 1094 (5th Cir. 2001) (unpublished) and *J.S. & H. Constr. Co. v. Richmond County Hosp. Auth.*, 473 F.2d 212, 216 (5th Cir. 1973)). The case of *Jewish Fed'n of Greater New Orleans v. Fid. & Deposit Co. of Maryland* does not compel a result in Plaintiff's favor for three main reasons. First, unlike this case, the Plaintiff which sought to compel arbitration against the surety in *Jewish Fed'n of Greater New Orleans* was a party to the bond at issue. 273 F.3d 1094 (5th Cir. 2001). The plaintiff ("the Federation") sought to compel the surety ("Fidelity" or "F&D") to arbitrate by arguing that the bond at issue incorporated an arbitration provision in a separate contract by reference. *Id.* The Federation prevailed. *Id.* ("As Fidelity conceded at oral argument, because its bond incorporates by reference the construction contract's arbitration provision, that provision is binding on Fidelity."). There, however, the contractor ("Goliath") and F&D had joint and severally bound themselves to the Federation as "the Owner." *See Jewish Fed'n of Greater New Orleans v. Fid. & Deposit Co. of Maryland*, 2001 WL 34154552, Appellate Brief dated May 16, 2001, at * 20. *See also id.*, 2001 WL 34154552, Appellee Brief dated June 13, 2001, at *2 ("Fidelity & Deposit Company of Maryland ("F&D") issued . . . (the "Bond"), identifying Goliath as principal, F&D as surety and the Federation as "owner" (the obligee under the Bond), binding F&D and Goliath to the Federation for

the performance of the Contract"). Because Plaintiff is not a party to the bond at issue in this case, *Jewish Fed'n of Greater New Orleans* is not on point and fails to support Plaintiff's Opposed Motion.

Second, *Jewish Fed'n of Greater New Orleans* involved a "broad" arbitration clause capable of "expansive reach." 273 F.3d at 1094 ("Both the Supreme Court and this court have concluded that similar arbitration clauses were broad and capable of expansive reach.") (citations omitted). Plaintiff has not shown that to be the case here. Third, *Jewish Fed'n of Greater New Orleans* is unpublished and does not appear to have involved the application of Texas Law. Thus, it is not binding on this Court, even if it were on point.

The case of *J.S. & H. Constr. Co. v. Richmond County Hosp. Auth.* similarly fails to compel a result in Plaintiff's favor. In *J.S. & H. Constr. Co.*, the Fifth Circuit held that a subcontractor was subject to an arbitration provision in a prime contract where the subcontract the subcontractor had signed had incorporated the arbitration provision by reference. 473 F.2d 212, 216. *J.S. & H. Constr. Co* did not involve a plaintiff attempting to compel a surety to participate in an arbitration when the plaintiff was neither a party to a contract with the surety which contained an arbitration provision, nor a party to a payment bond that allegedly incorporated an arbitration provision by reference. Plaintiff has failed to show that the Payment Bond and the incorporation-by-reference doctrine require this Court to compel NASIC to arbitrate Plaintiff's Lien Release and Bond Claims.

## C.  Plaintiff's Reliance upon the Direct-Benefits-Estoppel Doctrine.

Plaintiff's reliance upon the direct-benefits-estoppel doctrine does not disturb the conclusions reached above.  "Direct benefits estoppel applies when a non-signatory 'knowingly exploits the agreement containing the arbitration clause.'"  *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 355, 361–62 (citations omitted).  *See also Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 637 (Tex. 2018) ("Direct-benefits estoppel applies to parties who seek 'to derive a direct benefit' from a contract with an arbitration agreement.").  There are two ways the direct-benefits-estoppel doctrine can apply to bind a non-signatory to an arbitration agreement.  *ENGlobal U.S., Inc. v. Gatlin*, 449 S.W.3d 269, 275 (Tex. App. 2014) (citing *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131-35 (Tex. 2005)).

> First, a non-signatory who uses the litigation process to sue based on a contract subjects him or herself to the contract's terms.  [*In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131-35 (c]*iting In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755 (Tex. 2001).  A non-signatory sues "based on a contract" when he or she "seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision."  *Id. Quoting Kellogg Brown & Root*, 166 S.W.3d [732, 741 (Tex. 2005)].

> The second way in which direct-benefits estoppel may be applied to bind a non-signatory to an arbitration agreement is when the non-signatory "seek[s] or obtain[s] direct benefits from a contract by means other than a lawsuit."  *ENGlobal*, at 275 (quoting *Weekley Homes*, 180 S.W.3d at 132)).  Under this application of the doctrine, a non-signatory may be compelled to arbitrate if he or she deliberately seeks and obtains substantial benefits from the contract during the performance of the agreement.  *Weekley Homes*, at 132–33.  If the non-signatory consistently and knowingly insists that others treat it as a party to the contract during the life of the contract, the nonparty "cannot later 'turn [ ] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.'"  *Id.* at 135 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001)).

*Bailey v. HealthSouth Corp.*, No. 9:15-CV-57, 2017 WL 664445, at *5–6 (E.D. Tex. Jan. 26, 2017), *report and recommendation adopted*, No. 9:15-CV-00057-RC, 2017 WL 661964 (E.D. Tex. Feb. 16, 2017).

Plaintiff's briefing is somewhat vague, so it is not clear if Plaintiff is arguing that the first way of employing the doctrine applies in this case. *See* Dkt. No. 19 at 3-10. As noted directly above, the first way of employing the doctrine involves the filing of a claim against a signatory by a non-signatory, not the assertion of a defense to a claim. *See In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131-35 (noting that the first way of applying the doctrine involves the non-signatory suing and seeking to derive a direct benefit from a contract through a claim). *See also Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 355, 362 (noting the "important distinction" between cases where the doctrine might apply because the non-signatory has sued and cases where the non-signatory had not, and finding that the doctrine did not apply in the case before it because the non-signatory had not "sued" and thus not "exploited" the contract); *Janvey v. Alguire*, 847 F.3d 231, 242–43 (5th Cir. 2017) ("[Direct-benefits] estoppel 'prevents a nonsignatory from knowingly exploiting an agreement containing the arbitration clause.' *Graves v. BP Am., Inc.*, 568 F.3d 221, 223 (5th Cir. 2009). That is, 'a nonsignatory cannot sue under an agreement while at the same time avoiding its arbitration clause.' *Id.*").

NASIC has not sued Plaintiff or brought claims against Plaintiff arising from, or related to, the three contracts. NASIC also points out that the cases Plaintiff relies upon to support its direct-benefits-estoppel argument all involve "a non-signatory

bringing suit or asserting a claim" pursuant to an agreement. Dkt. No. 24 at 6.

Plaintiff has not responded to this statement, or otherwise shown how NASIC's

assertion of its litigation defenses equates to deriving a direct benefit from a contract

through a claim. To the extent that it intended to advance the argument, then,

Plaintiff has not shown that the first way of employing the doctrine is applicable here.

To the extent that Plaintiff is arguing that the second way of employing the

doctrine applies, its argument is misplaced. Plaintiff asserts that NASIC is seeking

direct benefits from the three contracts at issue by relying upon NGC's defenses to

Plaintiff's claims. Dkt. No. 19 at 3-4 ("It is NASIC's reliance upon the rights and

defenses of its principal, NGC, that creates the obligation of NASIC to arbitrate this

matter. . . . NGC's defenses are based on and governed by the Subcontracts and 'Prime

Contract.' Accordingly, NASIC is seeking to directly benefit from [those contracts].").

In support of this argument, Plaintiff alleges as follows:

> NASIC is relying on NGC's contract defenses to Ideal's claims, and is
> therefore seeking to directly benefit from the Subcontracts and "Prime
> Contract." If NASIC is seeking direct benefits from these contracts, and
> is seeking to enforce any of the contract provisions that it believes may
> defeat Ideal's claims, then NASIC should be bound by all provisions of
> these three contracts, including the arbitration provisions. In fact, this
> is what the law requires. As a result, the doctrine of direct-benefits
> estoppel applies and Defendant NASIC should be compelled to arbitrate
> pursuant to the contracts it continues to exploit.

*Id.* at 10.

The problem with Plaintiff's argument here is that Plaintiff has not cited any

on-point authority to back up its claim that "this is what the law requires." Dkt. No.

19 at 10. The second way of employing the direct-benefits-estoppel doctrine against

a non-signatory applies when that non-signatory deliberately seeks and obtains substantial benefits from a contract, during the performance of the contract, "by means other than a lawsuit." *Weekley Homes*, 180 S.W.3d at 132; *ENGlobal U.S., Inc. v. Gatlin*, 449 S.W.3d 269, 275. For example, the court in *Weekley Homes* applied direct-benefits-estoppel to require a home buyer's non-signatory daughter to arbitrate because the daughter had claimed authority under the home purchase agreement to demand repairs and otherwise force compliance with the agreement. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 ("Claiming the authority of the Purchase Agreement, she directed how Weekley should construct many of [the home's] features, repeatedly demanded extensive repairs . . . . Having obtained these substantial actions . . . by demanding compliance with [the Agreement], Von Bargen cannot equitably object to the [Agreement's] arbitration clause[.]"). NASIC has asserted its defenses in the context of a lawsuit, and in response to Plaintiff's claims. Plaintiff has not shown that NASIC has sought or obtained any direct or substantial benefit from any of the three contracts, during the performance of the contracts, by a means other than a lawsuit. To the extent that it intended to advance the argument, then, Plaintiff has not shown that the second way of employing the doctrine is applicable.

**D. Plaintiff's Reliance upon the Alleged Practical Reasons to Compel NASIC to Arbitrate.** The parties agree that NASIC, as NGC's surety, will be bound by the results of the arbitration between Plaintiff and NGC. Dkt. No. 8 at p. 3, ¶ 11; Dkt. No. 19 at p. 9, ¶ 19; Dkt. No. 24 at 11. Because NASIC will be so bound, Plaintiff argues that it will be practical to compel NASIC to participate in the arbitration

between itself and NGC.  Dkt. No. 19 at 11-13.  However, the fact that NASIC, as NGC's surety, will be bound by the results of the arbitration between Plaintiff and NGC is a fact that undermines, rather than supports, Plaintiff's argument.  Indeed, if NASIC is bound by the results of the arbitration between Plaintiff and NGC, there appear to be no practical reasons to require NASIC to participate in the arbitration. Requiring NASIC to participate would likely only result in increased work and costs for NASIC, with no corresponding benefit for any party.  This is especially the case given that NASIC has agreed that Plaintiff's claims against it should be stayed until after the arbitration between Plaintiff and NGC is resolved.  Dkt. No. 24 at 1, 11.

Plaintiff additionally argues that it would be impractical and inefficient to allow both litigation and arbitration proceedings to occur.  Dkt. No. 19 at 12.  In the same breath, however, Plaintiff admits that some of NASIC's defenses do not rely upon the terms of the Subcontracts or Prime Contract.  *See* Dkt. No. 19 at 10 ("NASIC has also asserted that Ideal's lien affidavits and notices were untimely and has denied that Ideal has timely and properly perfected a claim under the Payment Bond.  These defenses do not rely upon the Subcontracts or "Prime Contract.").  Plaintiff has not proposed any argument or theory requiring this Court to compel NASIC to arbitrate these defenses.  Therefore, if NASIC must litigate some of its defenses, it makes no practical sense to force NASIC to arbitrate its other defenses.  Forcing NASIC to participate in litigation and arbitration, when arbitration is not required, would cause more inefficiency, not less.

Finally, even if this were not the case, arbitration is a matter of contract, and "a party cannot be compelled to arbitrate any dispute absent an agreement to do so." *Robinson v. Home Owners Mgmt. Enterprises, Inc.*, No. 18-0504, 2019 WL 6223128, at *4 (Tex. Nov. 22, 2019) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) and *Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478-79 (1989)).  Plaintiff has not shown that NASIC is contractually obligated to arbitrate.  Its Opposed Motion should be denied, to the extent it seeks to compel NASIC to arbitrate its defenses against Plaintiff's claims.  However, to the extent it seeks a stay of litigation until the arbitration between itself and NGC is completed (*see* Dkt. No. 19 at 13), Plaintiff's Opposed Motion should be granted because Defendants also agree that a stay is necessary and appropriate.  Dkt. No. 24 at 1, 11.

## IV. Recommendation

It is recommended that the Court: (1) **DENY** Plaintiff's Opposed Motion to the extent it seeks to compel arbitration; (2) **GRANT** Plaintiff's Opposed Motion to the extent it seeks a stay of litigation; and (3) **DIRECT** the Clerk of Court to stay this case until further order of the Court.

## V. Notice to the Parties

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within

fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

SIGNED on this 4th day of February, 2020.

Ignacio Torteya, III
United States Magistrate Judge